# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1)** | **CHARLES CLARENCE TIGER,** | ) |
| | **Petitioner,** | ) |
| | | ) |
| **-vs-** | | ) |
| | | ) |
| **(1)** | **WILLIS PETTIT, WARDEN,** | ) |
| | **Respondent.** | ) |

---

## PETITION FOR WRIT OF HABEAS CORPUS
### BY A PERSON IN STATE CUSTODY PURSUANT TO 28 U.S.C. §2254
### AND BRIEF IN SUPPORT

---

**Submitted by,**

**DEBRA K. HAMPTON, OBA # 13621**
Hampton Law Office, PLLC
3126 S. Blvd., # 304
Edmond, OK 73013
Tel:    (405) 250-0966
Fax: (405) 896-4259
debbie@hamptonlaw.net
Attorney for Petitioner

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iv

CASES ............................................................................................................... iv

STATUTES .......................................................................................................... vi

OTHER AUTHORITIES .................................................................................... vii

TREATISES ....................................................................................................... vii

CONSTITUTIONAL PROVISIONS ................................................................. vii

I.        JURISDICTION ................................................................................. 1

II.       CUSTODY AND PARTIES ............................................................... 1

III.      JURISDICTION AND VENUE ......................................................... 2

IV.       PROCEDURAL HISTORY AND EXHAUSTION ............................ 2

V.        TIMELINESS UNDER 28 U.S.C. § 2244(d) ................................... 5

VI.       AEDPA STANDARD OF REVIEW .................................................. 6

VII.      GROUNDS FOR RELIEF ................................................................. 7

GROUND ONE: .................................................................................................. 7

        OKLAHOMA LACKED SOVEREIGN AUTHORITY TO PROSECUTE
        AND SENTENCE PETITIONER; CUSTODY UNDER THE AMENDED
        JUDGMENT VIOLATES THE CONSTITUTION, LAWS, AND
        TREATIES OF THE UNITED STATES.

        A.    The State lacked sovereign authority to prosecute Charles Tiger when
              it is clear there was a federal preemption. ...................................... 10

        B.    The Oklahoma Constitution ............................................................ 19

        C.    The Tenth Circuit's Interpretation of Oklahoma's Enabling Act. ... 20

        D.    The Tenth Circuit Determined that Land Belonging to the Indians Held
              by the Federal Government is Held in Federal Trust for the Indians. ........... 22

E.    Oklahoma Supreme Court's 1908 Interpretation of the Enabling Act. ..........23

F.    The Absence of Sovereign Authority is Structural Error................................24

GROUND TWO: ..............................................................................................................25

PETITIONER WAS DENIED DUE PROCESS BECAUSE HIS CASE WAS NOT HEARD BY AN IMPARTIAL ADJUDICATOR.

VIII.    CONCLUSION ..........................................................................................28

IX.    REQUEST FOR EVIDENTIARY HEARING ......................................................29

X.    RELIEF REQUESTED .......................................................................................30

# TABLE OF AUTHORITIES

**CASES**

*Antoine v. Washington*, 420 U.S. 194 (1975). ............................................................... 14

*Brewer-Elliott Oil & Gas Co. v. U.S.*, 260 U.S. 77 (1922) .......................................... 18, 19

*Browder v. City of Albuquerque*, 787 F.3d 1076, 1079 (10th Cir. 2015) ........................... 17

*Burck v. Taylor*, 152 U.S. 634, 14 S.Ct. 696, 38 L.Ed. 578 (1894) ................................... 24

*Burton v. Stewart,* 549 U.S. 147, 156-57 (2007) .................................................................. 5

*Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 876-87 (2009) ................................... 27

*Carter v. State*, 2006 OK CR 42, 147 P.3d 243 (2006) ...................................................... 26

*Cherokee Nation v. State of Oklahoma,*
  461 F.2d 674, 678 (10th Cir. 1972), *cert. denied*, 409 U.S. 1039 (1972) ..................... 22

*City of Tulsa  v. O'Brien,* 2024 OK CR 31, __ __ ............................................................. 10

*Coleman v. Thompson,* 501 U.S. 722, 729-32 (1991) ........................................................... 7

*Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518 (1938) ............................................ 18

*Connolly v. Union Sewer Pipe Co.*,
  184 U.S. 540, 548 (1902) ............................................................................................ 24

*Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) .................................................................... 27

*Draper v. U.S.,* 164 U.S. 240 (1896) ................................................................................... 23

*Durant v. State*, 2008 OK CR 17, 188 P.3d 192 (2008) ..................................................... 26

*Ewert v. Bluejacket*, 259 U.S. 129, 138 (1922) ................................................................. 24

*Gonzalez v. Thaler,* 565 U.S. 134, 149-50 (2012) ............................................................... 5

*Grayson v. State,* 2021 OK CR 8, 485 P.3d 250 ................................................................ 12

*Harrington v. Richter*, 562 U.S. 86, 100-03 (2011) ............................................................. 6

*In re Murchison*, 349 U.S. 133, 136 (1955) ...................................................................... 27

*Indian Country, U.S.A. v. Oklahoma Tax Com'n*,
   829 F.2d 967, 978 (10th Cir. 1987) ..................................................................20

*Jimenez v. Quarterman,* 555 U.S. 113, 119-21 (2009) ........................................5

*Johnson v. U.S.*,
   520 U.S. 461, 468-69 (1997) ...........................................................................24

*Magwood v. Patterson*, 561 U.S. 320, 332-33 (2010)..........................................5

*McCarty v. State*, 2005 OK CR 10, 114 P. 3d 1089..........................................26

*McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 175 (1973) ..........21

*McGirt v. Oklahoma*, 591 U.S. 894 (2020) .........................................................7

*Miller v. Ammon*, 145 U.S. 421, 426 (1892) .....................................................24

*Murphy v. Royal,* 866 F.3d 1164 (10th Cir. 2017) ............................................17

*Neder v U.S.*, 527 U.S. 1, 8 (1999) ....................................................................24

*Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123 (1993)................15

*Pacheco v. Habti,*
   62 F.4th 1233, 1245-46 (10th Cir. 2023), *cert. denied,* 143 S.Ct. 2672 (2023)..............9

*Pittsburg & Midway Coal Mining Co. v. Yazzie*,
   909 F.2d 1387, 1395 (10th Cir. 1990).............................................................16

*Schriro v. Landrigan,* 550 U.S. 465, 473-75 (2007) ........................................29

*Seymour v. Superintendent of Wash. State Penitentiary*,
   368 U.S. 351, 356-358 (1962) .........................................................................15

*Seymour v. Superintendent*, 368 U.S. 351, 359 (1962) .....................................22

*Solem v. Bartlett*, 465 U.S. 463, 469 (1984)....................................................9, 15

*State ex rel. Matloff v. Wallace,* 2021 OK CR 21, 497 P.3d 686 ........................4

*State v. Doxtater*, 47 Wis. 278, 2 N.W. 439 .....................................................24

*Tumey v. Ohio*, 273 U.S. 510, 535 (1927)..........................................................27

*U.S. v. Bailey*, 24 F.Cas. 937, No. 14,495 ........................................................24

v

*U.S. v. Champlin Refining Co.*, 156 F.2d 769 (10th Cir. 1946) .......................................... 19

*U.S. v. Cronic*, 466 U.S. 648, 659 (1984)................................................................. 24

*U.S. v. Kagama*, 118 U.S. 375, 6 S. Ct. 1109, 30 L.Ed. 228 ............................................. 24

*U.S. v. Langford,* 641 F.3d 1195, 1197, fn. 1 (10th Cir. 2011) ......................................... 10

*U.S. v. McBratney,* 104 U.S. 621 (1882) .............................................................. 23

*U.S. v. Sands*, 968 F.2d 1058, 1062 (10th Cir. 1992) ................................................. 22

*U.S. v. Winans,* 198 U.S. 371, 383 (1905) ............................................................ 15

*United States v. Pearson*, 203 F.3d 1243, 1277 (10th Cir. 2000) ...................................... 27

*Waskey v. Hammer*, 223 U.S. 85, 94 (1912) ........................................................... 24

*Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017) ................................................... 27

*Williams v. Pennsylvania,* 579 U.S. 1, 8-14 (2016) .................................................... 28

*Williams v. Taylor,* 529 U.S. 362, 404-13 (2000) ...................................................... 6

*Wilson v. Sellers,* 584 U.S. 122 (2018)................................................................. 7

**STATUTES**

22 O.S. §, 812.1(A)...................................................................................... 26

25 U.S.C. § 1324 ........................................................................................ 21

25 U.S.C. § 71 .......................................................................................... 13

25 U.S.C. §§ 1321-26 .................................................................................... 21

28 U.S.C. § 1360 ........................................................................................ 21

28 U.S.C. § 2241(d)....................................................................................... 2

28 U.S.C. § 2244(d)....................................................................................... 5

28 U.S.C. §2254 .......................................................................................... i

34 Stat. 148. ........................................................................................... 22

34 Stat. 267 ..........................................................................................................22, 23

34 Stat. at 267-68 ....................................................................................................... 20

48th Congress, Session 2, Chapter 341, Section 8 ............................................................ 13

67 Stat. 588 ................................................................................................................21

**OTHER AUTHORITIES**

1 *William Blackstone, Commentaries* *133 ....................................................................... 17

A. Debo, And Still the Waters Run 86-87, 117-118 (1940) .............................................. 17

**TREATISES**

Treaty with the Creeks, Arts. I, XIV, Mar. 24, 1832, **7 Stat. 366**, 368 .............................. 11

Treaty with the Creeks, preamble, Feb. 14, 1833, **7 Stat. 418** ......................................... 11

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. II, Section 2 ......................................................................................... 12

U.S. Const. art. VI, cl. 2. .............................................................................................. 12

Okla. Const. art. I § 3 ............................................................................................. 18, 19, 20

Okla. Const., art 7, § 7 (a) ............................................................................................ 19

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

(1)    **CHARLES CLARENCE TIGER,**          )
                    **Petitioner,**                )
                                                    )
**-vs-**                                            )
                                                    )
(2)    **WILLIS PETTIT, WARDEN,**          )
                    **Respondent.**               )

**PETITION FOR WRIT OF HABEAS CORPUS AND BRIEF IN SUPPORT**
**BY A PERSON IN STATE CUSTODY PURSUANT TO 28 U.S.C. § 2254**

COMES NOW Petitioner, **Charles C. Tiger # 276550**, through his attorney Debra K. Hampton, and petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner in custody of the Oklahoma Department of Corrections, incarcerated at the Oklahoma State Penitentiary in McAlester Oklahoma. Petitioner challenges the constitutionality and legality of the judgment authorizing his present custody. In support, Petitioner states as follows:

## I.     JURISDICTION

The action does not involve diversity jurisdiction.

## II.     CUSTODY AND PARTIES

1.     Petitioner Charles Clarence Tiger is a state prisoner in the custody of the Oklahoma Department of Corrections.

2.     Respondent Willis Pettit, Warden, is named as the proper respondent because Petitioner is in custody under Respondent's authority. *See* Rule 2(a), Rules Governing Section 2254 Cases.

1

3.     Petitioner is in custody pursuant to Oklahoma County District Court Case No. CF-2003-69. The operative judgment authorizing the custody challenged here is the Amended Judgment and Sentence entered September 9, 2024.

## III.    JURISDICTION AND VENUE

This Court has jurisdiction under 28 U.S.C. §§ 2241 and 2254(a) because Petitioner is in custody pursuant to a state-court judgment and contends that his custody violates the Constitution, laws, and treaties of the United States. Venue is proper in this Court because Petitioner is confined in Oklahoma under an Oklahoma judgment and the challenged conviction was entered in Oklahoma County, within the Western District of Oklahoma. 28 U.S.C. § 2241(d).

## IV.    PROCEDURAL HISTORY AND EXHAUSTION

### A.  Original conviction and sentence.

Petitioner was convicted by a jury in the District Court of Oklahoma County, Case No. CF-2003-69. The convictions included Conspiracy to Commit a Felony, Burglary in the Second Degree, Assault and Battery with a Deadly Weapon with Intent to Kill, Burglary in the First Degree, Pointing a Firearm at Another, Robbery with a Firearm, Attempted Burglary in the First Degree, and Possession of a Firearm After Former Conviction of a Felony. The jury set punishment at fifteen years on Count 1, ten years on Count 2, 350 years on Counts 7 and 12, thirty years on Counts 8, 10, and 11, and twenty years on Counts 9, 13, and 14. Sentencing was held October 26, 2004, and Judge Twyla Mason Gray ordered the sentences to run concurrently.

2

B.    **Direct appeal.**

Petitioner timely perfected a direct appeal to the Oklahoma Court of Criminal Appeals. Petitioner raised seven (7) propositions of error on direct appeal:

1.    Mr. Tiger's fundamental right to a speedy trial under the Federal and State constitution was violated;

2.    A breakdown in communication between trial counsel and the Appellant resulted in ineffective assistance of counsel;

3.    Appellant has been subjected to double punishments which require dismissal of Count 10 Burglary in the First Degree;

4.    The State presented insufficient evidence to support Mr. Tiger's conviction for Conspiracy to Commit Burglary in the Second Degree in violation of the Due Process Clause of the Federal and State constitutions.

5.    Convictions for both Conspiracy to Commit Second Degree Burglary and Second-Degree Burglary violate State and Federal Constitutional Prohibitions against double jeopardy;

6.    Errors, when considered in a cumulative fashion, warrant a new trial or a modification of Mr. Tiger's sentences; and,

7.    Mr. Tiger's sentences are excessive, disproportionate, and violative of Federal and State constitutional prohibitions against cruel and unusual punishment.

In an unpublished opinion issued March 6, 2006, in Case No. F 2004-1127, the Oklahoma Court of Criminal Appeals (OCCA) found Propositions Three and Four meritorious, reversed and remanded Counts 1 and 10 with instructions to dismiss and otherwise affirmed.

C. **Amended Judgment and Sentence.**

Although the OCCA directed dismissal of Counts 1 and 10 on direct appeal, an Amended Judgment and Sentence was not entered until September 9, 2024. Petitioner

3

challenges the custody-authorizing judgment now in effect, including that 2024 Amended Judgment and Sentence.

### D. State post-conviction proceedings.

On December 27, 2024, Petitioner, through counsel, filed an Application for Post-Conviction Relief and Request for Evidentiary Hearing in Oklahoma County District Court. Petitioner raised two federal grounds: (1) Oklahoma lacked sovereign authority over Petitioner because the land in question is reservation land and the State's prosecution is preempted by federal law and treaty promises; and (2) Petitioner was denied the constitutional right to have his case heard by an impartial adjudicator.

### E. District court ruling.

The District Court denied post-conviction relief on May 7, 2025. Petitioner timely initiated a post-conviction appeal.

### F. OCCA decision.

On October 8, 2025, in Case No. PC-2025-531, the OCCA affirmed the denial of post-conviction relief. The OCCA rejected the jurisdictional claim under *State ex rel. State ex rel. Matloff v. Wallace,* 2021 OK CR 21, 497 P.3d 686, reasoning that *McGirt v. Oklahoma*, 591 U.S. 894 (2020) is not retroactive and does not void final state convictions, and concluded that Petitioner's convictions were final before the July 9, 2020 decision in *McGirt*. The OCCA also affirmed denial of the judicial-bias claim on procedural-bar grounds, holding that Petitioner failed to show why that claim could not have been raised on direct appeal.

**G. Exhaustion.**

The claims presented here were fairly presented to the Oklahoma courts through the post-conviction proceedings and post-conviction appeal. Petitioner has exhausted available state remedies as to the grounds raised in this Petition. 28 U.S.C. § 2254(b)(1)(A).

## V.    TIMELINESS UNDER 28 U.S.C. § 2244(d)

This Petition is timely. Petitioner challenges the custody-authorizing judgment now in effect, including the Amended Judgment and Sentence entered September 9, 2024. For federal habeas purposes, the "judgment" includes the sentence. *Burton v. Stewart,* 549 U.S. 147, 156-57 (2007). A new judgment entered after resentencing or amendment is treated as a new judgment for habeas purposes. *Magwood v. Patterson*, 561 U.S. 320, 332-33 (2010).

The limitations period did not begin to run until the amended judgment became final by the conclusion of direct review or expiration of the time to seek direct review. *Gonzalez v. Thaler,* 565 U.S. 134, 149-50 (2012); *Jimenez v. Quarterman,* 555 U.S. 113, 119-21 (2009). Petitioner filed his properly filed post-conviction application on December 27, 2024. That application and the subsequent post-conviction appeal tolled the limitations period under 28 U.S.C. § 2244(d)(2) until the OCCA issued its decision and mandate on October 8, 2025. This Petition is timely.

In the alternative, to the extent Respondent contends the 2024 Amended Judgment and Sentence did not restart the limitations period, Petitioner asserts equitable tolling and the miscarriage-of-justice exception because the State continues to hold Petitioner under

a judgment entered without sovereign authority and by a process infected by structural due-process error. Petitioner preserves those arguments for further factual development if Respondent raises timeliness as a defense.

## VI.    AEDPA STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), a federal court may grant relief on a claim adjudicated on the merits in state court if the state-court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings. *Williams v. Taylor,* 529 U.S. 362, 404-13 (2000); *Harrington v. Richter*, 562 U.S. 86, 100-03 (2011).

A state-court decision is contrary to clearly established federal law if it applies a rule that contradicts governing Supreme Court precedent or reaches a result different from a Supreme Court decision on materially indistinguishable facts. *Williams,* 529 U.S. at 405-06. A state-court decision involves an unreasonable application of clearly established law when it correctly identifies the governing rule but unreasonably applies it to the facts. *Id.* at 407-08. A decision rests on an unreasonable factual determination when the state court's critical factual premise is not fairly supported by the record. 28 U.S.C. § 2254(d)(2); *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003).

When the last state-court decision is summary or relies on a procedural ground, the federal habeas court determines whether the state decision rests on an adequate and independent state ground and, where appropriate, looks through to the last reasoned state-

6

court decision. *Wilson v. Sellers,* 584 U.S. 122 (2018); *Coleman v. Thompson,* 501 U.S. 722, 729-32 (1991)

## VII.    GROUNDS FOR RELIEF

**GROUND ONE:**
**OKLAHOMA LACKED SOVEREIGN AUTHORITY TO PROSECUTE AND SENTENCE PETITIONER; CUSTODY UNDER THE AMENDED JUDGMENT VIOLATES THE CONSTITUTION, LAWS, AND TREATIES OF THE UNITED STATES.**

### ARGUMENT AND AUTHORITY

Petitioner's case arose in Oklahoma County. Petitioner alleged in state court that the land in question remains reservation land, that treaty promises and federal law preempted Oklahoma's exercise of sovereign authority, and that Oklahoma therefore lacked authority to convict and punish him. Petitioner relied on *McGirt v. Oklahoma*, 591 U.S. 894 (2020), the Supremacy Clause, the Creek treaty promises, the federal definition of Indian country in 18 U.S.C. § 1151, and the principle that only Congress may diminish or disestablish a reservation by clear expression.

*McGirt* held that the Muscogee (Creek) Reservation remains Indian country for purposes of federal criminal law because Congress never clearly disestablished it. 591 U.S. at 913, 932-34. McGirt further explained that land patents and allotment do not automatically eliminate reservation status; Congress defined Indian country to include all land within the limits of an Indian reservation notwithstanding the issuance of any patent. 18 U.S.C. § 1151(a); *McGirt,* 591 U.S. at 907-08, 922-27. Petitioner's state pleadings asserted that the same treaty, patent, and preemption principles foreclose Oklahoma's claimed sovereign authority over the land at issue.

7

The OCCA rejected the claim by relying on Matloff and by treating Petitioner's case as a final pre-McGirt conviction. The OCCA reasoned that McGirt is not retroactive and does not void final state convictions, then concluded that Petitioner's convictions were final before July 9, 2020 and that McGirt did not apply.

Why the state-court decision warrants habeas relief. The OCCA's adjudication rests on an unreasonable premise because Petitioner is not challenging an unchanged pre-2020 judgment. He is in custody under an Amended Judgment and Sentence entered September 9, 2024. A state court cannot treat the operative custody judgment as final years earlier for purposes of avoiding merits review when the State later entered a new custody-authorizing judgment. Federal habeas law treats the judgment as including the sentence, *Burton,* 549 U.S. at 156-57, and treats a new judgment as a new judgment for habeas purposes, *Magwood*, 561 U.S. at 332-33. The state court's reliance on pre-2020 finality was therefore contrary to, or an unreasonable application of, clearly established Supreme Court law and was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1)-(2).

*Matloff* bar is keyed to final convictions. Once the State entered the Amended Judgment and Sentence in 2024, Petitioner's current custody was not authorized by a judgment that could be treated as a final judgment before *McGirt* for habeas purposes. The OCCA's refusal to address the sovereign-authority claim on that ground deprived Petitioner of a merit-based review of a federal claim directed at the judgment now authorizing his custody.

The state-court disposition also conflicts with the Supremacy Clause and the Supreme Court's Indian-country framework. The Constitution, federal statutes, and treaties are the supreme law of the land. U.S. Const. art. VI, cl. 2. Under *McGirt* and *Solem v. Bartlett*, 465 U.S. 463, 470 (1984), courts must ask whether Congress clearly expressed an intent to diminish or disestablish a reservation. Doubt is resolved in favor of the tribal promise. *McGirt,* 591 U.S. at 904-05. Petitioner alleged that the treaties and patents applicable here preserved federal and tribal authority and that Oklahoma could not identify a congressional act conferring state criminal authority over the land in question. The state courts did not conduct the required federal-law analysis; instead, the OCCA avoided the claim through an erroneous retroactivity/finality premise.

Petitioner acknowledges that Respondent may rely on Tenth Circuit decisions holding that McGirt did not announce a new constitutional right for purposes of restarting AEDPA's limitations period or authorizing successive petitions. *See, e.g., Pacheco v. Habti*, 62 F.4th 1233, 1245-46 (10th Cir. 2023), *cert. denied,* 143 S.Ct. 2672 (2023). This Petition does not rely on *McGirt* as a newly recognized constitutional right under § 2244(d)(1)(C). The claim is directed to the State's lack of sovereign authority, the Supremacy Clause, federal treaty/statutory preemption, and the 2024 Amended Judgment and Sentence that now authorizes custody. Petitioner preserves the argument that Matloff cannot be used to bar merits review of the federal claim as applied to this new operative judgment.

Because Oklahoma lacked sovereign authority to prosecute and punish Petitioner, and because the state court denied the claim on an unreasonable legal and factual

9

premise, this Court should grant the writ, vacate the Amended Judgment and Sentence, and order Petitioner released unless the proper sovereign timely obtains lawful custody and prosecution.

### A. The State lacked sovereign authority to prosecute Charles Tiger when it is clear there was a federal preemption.

The State court lacked authority to prosecute Petitioner because the land in Oklahoma County could never have been part of a state or territory. The Tenth Circuit has stated, "[w]hen we speak of jurisdiction, we mean sovereign authority, not subject-matter jurisdiction." *U.S. v. Langford,* 641 F.3d 1195, 1197, fn. 1 (10th Cir. 2011). The history of Oklahoma County is relevant to the matter at hand and clearly indicates a federal preemption that is established by federal law.

In a recent decision from the Oklahoma Court of Criminal Appeals (OCCA) in *City of Tulsa  v. O'Brien,* 2024 OK CR 31, __ __, addressed in part under section IV PREEMPTION OF STATE JURISDICTION. The OCCA held that the prosecution of O'Brien was not preempted under federal law or by principles of tribal self-government. *O'Brien,* 2024 OK CR 31, ¶1. However, the OCCA's analysis in *O'Brien* is merely dicta because, in a proper analysis beginning where that preemption started, a Court can only conclude there is absolutely no State jurisdiction of the land in question. Oklahoma has no authority to enforce State statutes on the Creek reservation, "[n]or has Congress ever passed a law conferring jurisdiction on Oklahoma." *McGirt v. Oklahoma,* 591 U.S. ____, 140 S.Ct. 2478, 2458, 207 L.Ed.2d 985 (2020) In *O'Brien,* the OCCA rejects any possibility of federal preemption, stating there is no federal law preemption jurisdiction.

For the analysis set forth below, Petitioner argues there is a lack of sovereign authority to prosecute any offense by the State, and the State cannot possibly point to any act of Congress establishing that it has authority on the land in question.

On the far end of the Trail of Tears was a promise. Forced to leave their ancestral lands in Georgia and Alabama, the Creek Nation received assurances that **their new lands in the West would be secure forever**. In exchange for ceding "all their land, East of the Mississippi river," the U.S. Government agreed by treaty that "[t]he Creek country west of the Mississippi shall be solemnly guaranteed to the Creek Indians." Treaty with the Creeks, Arts. I, XIV, Mar. 24, 1832, **7 Stat. 366**, 368 (1832 Treaty). Both parties settled on boundary lines for a new and "permanent home to the whole Creek Nation," located in what is referred to as Oklahoma. Treaty with the Creeks, preamble, Feb. 14, 1833, **7 Stat. 418** (1833 Treaty). *McGirt v. Oklahoma,* 591 U.S. ____, 140 S.Ct. 2452, 2458, 207 L.Ed.2d 985 (2020). An 1833 treaty fixed borders for a "permanent home to the whole Creek Nation of Indians," **7 Stat. 418**, and promised that the United States would "grant a patent, in fee simple, to the Creek Nation of Indians for the [assigned] land" to continue "so long as they shall exist as a Nation and continue to occupy the country hereby assigned to them," *Id.* at 419. The patent was formally issued in 1852: *McGirt, supra,* 140 S.Ct. at 2457. Congress has since broken more than a few promises to the Tribe. Nevertheless, the Creek Reservation persists today. 140 S.Ct. at 2461-2474.

In *McGirt*, Oklahoma claimed that Congress ended the Creek Reservation during the so-called allotment era, but the Supreme Court rejected that argument. What the *McGirt* Court found "missing" from the Creek allotment statutes is a statute evincing

11

anything like the "present and total surrender of all tribal interests" in the affected lands, which the same can be said of the Seminoles. Because there exists no equivalent law terminating what remained, the [Seminole Reservation] survived allotment. The OCCA first recognized the Seminole Reservation in the post-McGirt direct appeal of *Grayson v. State,* 2021 OK CR 8, 485 P.3d 250.

An 1856 treaty promised that "no portion" of Creek lands "**would ever be embraced or included within, or annexed to, any Territory or State,"** and that the Creeks would have the "unrestricted right of self-Government," with "full jurisdiction" over enrolled Tribe members and their property: *McGirt, supra,* 140 S.Ct. at 2457. So, the Creek were promised not only a "permanent home" that would be "forever set apart" but also a right to self-government on lands that would lie outside the legal jurisdiction and geographic boundaries of any State. *Id*. The *McGirt* Court also found that they "must hold the government to its word." But over the years, this promise was broken, but maybe no one ever stopped to think about the promises that were broken. The fact that the land was to be set aside from any state is codified in the treaty and establishes a clear preemption because the land was never to become a part of a Territory or State.

In the United States, treaties are federal law and thus preempt state law. The treaty power is granted by Article II, Section 2 of the Constitution, under which the President may make a treaty by and with the advice and consent of the Senate, with the concurrence of two-thirds of those present. Further, Article VI, paragraph 2 of the United States Constitution, also known as the Supremacy Clause, establishes that the Constitution, federal laws, and treaties are the "supreme Law of the Land". This means

they take precedence over any state laws that conflict with them. The Supremacy Clause also requires that state courts adhere to the supreme law and that state constitutions are subordinate to it.  That is why, once a federal reservation is established, only Congress can diminish or disestablish it, and doing so requires a clear expression of congressional intent. *McGirt, supra,* 140 S.Ct. at 2461-2463.

In 1889, the Federal Government offered this territory to non-Native Americans for settlement in the Oklahoma Land Rush. However, when the U.S. wanted to open the Unassigned lands not reallocated to other Native peoples—for non-Native settlement— they had to get permission from the Creek and Seminole Nations, because the 1866 treaty only allowed for other Native tribes and Freedmen to be assigned reservations. While only other Indians or Freedmen were to be located on the land, the Government claimed that while the cloud was on the title, no white citizen could make settlement. By an Act of March 3, 1885 [48th Congress, Session 2, Chapter 341, Section 8], a commission was appointed to negotiate a new deal with these two tribes whereby the clause as to the "***friendly Indians and Freedmen***" was stricken from the treaty of 1866. This did not nullify the treaty, nor did it invalidate the treaty in any way, nor had it affected the patent issued in 1852. Then in 1871 it marked the end of the treaty era in "The Act of Mar. 3, 1871, 16 Stat. 544, 566, now codified as 25 U.S.C. § 71 which provides: 'No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be invalidated or impaired.'" *Id.,*

13

at 202, n. 8. *Antoine v. Washington*, 420 U.S. 194 (1975). There was absolutely no authority which allowed the treaty promises to be broken.

Once opened for non-Native settlement, the Unassigned lands were still part of the reservation lands because the patent conferred the title to the Creek Nation had never been withdrawn. This is important because the land opened for settlement for non-Natives only operated to remove the cloud on the land for the United States, not a release of jurisdiction or sovereignty over the land. The patent was never withdrawn, nor can the State point to any act which provides a basis to terminate the patent. Further, the settlement of these lands came through land patents, just as the allotments, which we find did not diminish the reservation. The *McGirt* Court stated:

> [I]t isn't so hard to see why. The Federal Government issued its own land patents to many homesteaders throughout the West. These patents transferred legal title and are the basis for much of the private land ownership in a number of states today. However, no one thinks this diminished the United States' claim to sovereignty over any land. Accomplishing that would require an act of cession, the transfer of a sovereign claim from one Nation to another. 3 E. Washburn, American Law of Real Property *521-*524. And there is no reason why Congress cannot reserve land for tribes in much the same way, allowing them to continue to exercise governmental functions over land even if they no longer own it communally. Indeed, such an arrangement seems to be contemplated by 18 U.S.C. § 1151 (a)'s plain terms."

*McGirt, supra, at 2464.*

Oklahoma is different, and the 1852 patent issued preserved the Creeks as a forever home set apart and aside from any state. These land patents were derived from the U.S. Constitution, and thus, federal authority exists over any territory and is subject to laws enacted by Congress. Those patents are still in force; the United States Government

honors those patents by treaty law. *U.S. v. Winans,* 198 U.S. 371, 383 (1905). To further show that the congressional intent was clear that the patents did not dimmish reservation status, or the treaty promises 18 U.S.C. § 1151 is clear:

> Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, **notwithstanding the issuance of any patent**, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

*McGirt* has already rejected the argument that allotments automatically ended reservations. *McGirt,* at 2457. "Remember, Congress has defined "Indian country" to include "all land within the limits of any Indian reservation... notwithstanding the issuance of any patent, and, including any rights-of-way running through the reservation." 18 U.S.C. § 1151(a). The allotment act "did no more than open the way for non-Indian settlers to own land on the reservation" *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 356-358 (1962). "Congress has defined Indian Country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States." *See Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123 (1993). "[S]ome surplus land acts diminished reservations, and other surplus land acts did not." *Solem v. Bartlett*, 465 U.S. 463, 469 (1984), "Congress was dealing with the surplus land question on a reservation-

15

by-reservation basis, with each surplus land act employing its own statutory language, the product of a unique set of tribal negotiation and legislative compromise." *Id.*

While the OCCA did not agree with Patrick Murphy nor any of the previous applications filed by numerous Petitioners the United States Supreme Court found the OCCA's analysis and determinations inconsistent with the law. The OCCA was hostile to reservations and Indian communal life but did not establish that a particular reservation was disestablished:

> Although the Congresses that passed the surplus land acts anticipated the imminent demise of the reservation and, in fact, passed the acts partially to facilitate the process, we have never been willing to extrapolate from this expectation a specific congressional purpose of diminishing reservations with the passage of every surplus land act. Rather, it is settled law that some surplus land acts diminished reservations, and other surplus land acts did not.

*Solem,* at 468-69; *see also Pittsburg & Midway Coal Mining Co. v. Yazzie*, 909 F.2d 1387, 1395 (10th Cir. 1990).

Petitioner argues that *McGirt* was not an opinion which cherry picked statutes and treaties but interpreted the law for the congressional intent, the same manner as the OCCA does/should do legislative intent. In *McGirt* the Court rejected the history relied upon by Oklahoma finding it unconvincing:

> [t]his history proves no more helpful in discerning statutory meaning. Maybe, as Oklahoma supposes, it suggests that some white settlers in good faith thought the Creek lands no longer constituted a reservation. But maybe, too, some didn't care, and others never paused to think about the question. Certain historians have argued, for example, that the loss of Creek land ownership was accelerated by the discovery of oil in the region during the period at issue here. A number of the Federal officials charged with implementing the laws of Congress were apparently openly conflicted, holding shares or board positions in the very oil companies who sought to

16

deprive Indians of their lands. A. Debo, And Still the Waters Run 86-87, 117-118 (1940)**. And for a time, Oklahoma's courts appear to have entertained _sham_ competency and guardianship proceedings** that divested Tribe members of oil rich allotments. *Id.*, at 104-106, 233-234; Brief for Historians et al. as Amici Curiae 26-30. Whatever else might be said about the history and demographics placed before us, they hardly tell a story of unalloyed respect for tribal interests.

*McGirt, supra,* at 2473.

The constitutional due process guarantee traces its roots to the Magna Carta and the effort to deny capricious kings the "power of destroying at pleasure," what Blackstone called the "highest degree" of tyranny. 1 *William Blackstone, Commentaries* *133. So perhaps it comes as little surprise we should look to the history of efforts to tame arbitrary governmental action to determine whether and under what conditions the conduct at issue is accepted as a necessary incident of organized society—or whether it is associated with the sort of whimsical sovereign the due process guarantee was designed to guard against. *Browder v. City of Albuquerque*, 787 F.3d 1076, 1079 (10th Cir. 2015) (GORSUCH, Circuit Judge writing for the panel). Our tradition suggests that we can and should usually expect more from the sovereign than deliberate indifference to fundamental rights like **life, liberty, and property**. *Id.* 787 F.3d at 1080. (emphasis added).

Further, because of treaty rights, the preemption begins with those rights, not the Oklahoma Enabling Act. The Enabling Act only reinforced the fact there was a preemption as it would not allow the Creek lands to become part of a state. In *Murphy v. Royal,* 866 F.3d 1164 (10th Cir. 2017) the Court held that (in 1897, Congress imposed several measures to force the Creek Nation's agreement to the allotment policy. Congress

17

(1) "provid[ed] that the body of Federal law in Indian Territory, which included the incorporated Arkansas laws, was to apply irrespective of race.") There are three methods by which the United States obtains exclusive or concurrent jurisdiction over Federal lands in a State; Okla clarifies the third method. Okla. Const. art. I § 3 "**a reservation of Federal jurisdiction upon the admission of a State into the Union**" *See Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518 (1938).

What is not left to the imagination is the Federal land patents issued to the homesteaders, which were the same as the allotments given to the Indians. The allotments came by way of land patents. With the enactment of the Federal Land Policy and Management Act of 1976 (FLPMA), Congress expressly declared that the remaining public domain lands generally would remain in Federal ownership. *See* 43 U.S.C. §§ 1701, et seq. Simply because the United States could dispose of their land, allowing allotments was not different. It did nothing to alter that the United States retained jurisdiction over those lands because Oklahoma claimed no ownership over those lands at the time of statehood when the disclaimers were clear in the Oklahoma Constitution.

Further, the land patent was issued before Oklahoma asserting authority over the land, which Oklahoma could not destroy a title already accrued under federal law, and the United States Supreme Court's opinion was clear in *Brewer-Elliott Oil & Gas Co. v. U.S.*, 260 U.S. 77 (1922) which held:

> The question here is what title, if any, the Osages took in the riverbed in 1872 when this grant was made, and that was thirty-five years before Oklahoma was taken into the Union and before there were any local tribunals to decide any such questions. The title of the Indians grows out of a **federal grant when the Federal Government had complete**

18

**sovereignty over the territory in question.** Oklahoma when she came into the Union, took sovereignty over the public lands in the condition of ownership as they were then, and, if the bed of a non-navigable stream had then become the Property of the Osages, **there was nothing in the admission of Oklahoma into a constitutional equality of power with other States which required or permitted a divesting of the title.** It is not for a State by courts or legislature, in dealing with the general subject of beds of streams, to adopt a retroactive rule for determining navigability which would destroy a title already accrued under federal law and grant or would enlarge what actually passed to the State, at the time of her admission, under the constitutional rule of equality here invoked.

*Id.* at 87-88 (emphasis added). *See also U.S. v. Champlin Refining Co.*, 156 F.2d 769 (10th Cir. 1946). The same applies here because Oklahoma could not divest the title and there was nothing that allowed Oklahoma to assert authority over land is outside the jurisdiction of the state.

Further, *Brewer-Elliott Oil & Gas Co. v. U.S.*, also rejected the fact that Oklahoma entered the Union with a constitutional equality of power with other States which clearly Oklahoma was not on Equal-Footing. Okla. Const. Art. I § 3 specifically reads **"that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States."** For Oklahoma to retain jurisdiction it would take an Act of Congress and require a cession.

### B.   The Oklahoma Constitution

The State may wish to assert it has vested itself with jurisdiction under Okla. Const., art. VII, § 7 (a), which provides: "The District Court shall have unlimited original jurisdiction of all justiciable matters, <u>except as otherwise provided in this Article, and such powers of review of administrative action as may be provided by statute</u>" (emphasis

19

added). However, this Article has a built-in preemption which clearly states, **"except as otherwise provided …"** Succinctly stated, Okla. Const., art. I, § 3 preempts and supersedes art. VII, § 7 (a) by plain and obvious terms and therefore the District Court is not a Court of Competent jurisdiction rendering any judgment imposed *void ab initio* merely because of the land status.

### C. The Tenth Circuit's Interpretation of Oklahoma's Enabling Act.

The Enabling Act preserved the authority of the Federal Government over Indians and their lands and required the State to disclaim "all right and title" to such lands. See §§ 1, 3, 34 Stat. at 267-68, 270. *Indian Country, U.S.A. v. Oklahoma Tax Com'n*, 829 F.2d 967, 978 (10th Cir. 1987), *cert. denied*, 487 U.S. 1217, 108 S.Ct. 2870, 101, L.Ed.2d 2906 (1988). The Tenth Circuit rejected the State's interpretation of Oklahoma's Enabling Act because the State's construction completely ignored the effect of section one of the Act, in which Congress explicitly preserved Federal authority. Section one provides that:

> nothing contained in the said Constitution shall be construed to limit or impair the rights of person or property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law or otherwise, which it would have been competent to make if this Act had never been passed.

*Indian Country, U.S.A. v. Oklahoma Tax Com'n*, 829 F.2d at 979.

The Oklahoma Enabling Act, § 1, 34 Stat. at 267-68, is a general reservation of Federal and tribal jurisdiction over "Indians, their lands, [and] property," except as extinguished by the tribes or the Federal—not State—Government. *Id.* Therefore because

20

the Federal Government has not extinguished its sovereignty over the land, Oklahoma

County does not have jurisdiction. Further, the Court held:

> [t]he language of the Oklahoma act, read in its historical context, suggests that Congress intended to preserve its jurisdiction and authority over Indians and their lands in the new State of Oklahoma until it accomplished the eventual goal of terminating the tribal governments, assimilating the Indians, and dissolving completely the tribally-owned land base — events that never occurred and goals that Congress later expressly repudiated. The State has failed to cite any acts of Congress that clearly reveal an intent to divest the Federal and tribal governments of jurisdiction over Creek tribal lands and to confer such authority on the State of Oklahoma. *Id.* at 979-980.

The Court further explained in its analysis:

> Our interpretation of Oklahoma's Enabling Act is consistent with the way in which Congress interpreted the act in 1953 when it addressed the matter of state jurisdiction over Indian country. In that year, Congress enacted Public Law 83-280 to permit states to assert limited civil and broad criminal jurisdiction in Indian country. See Act of Aug. 15, 1953, ch. 505, 67 Stat. 588 (Public Law 280) (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321-26, 28 U.S.C. § 1360 (1982 & Supp.1985)). Congress included a provision that operated to "give consent of the United States to those States presently having organic laws expressly disclaiming jurisdiction to acquire jurisdiction subsequent to enactment by amending or repealing such disclaimer laws." See S. Rep. No. 699, 83d Cong., 1st Sess., reprinted in 1953 U.S. Code Cong. & Admin. News 2409, 2412; *see also* Public Law 280, § 6, 67 Stat. at 590 (codified as amended at 25 U.S.C. § 1324). The Committee Report listed Oklahoma among the states with such disclaimers and stated that the "[e]ffect of the disclaimer of jurisdiction over Indian land within the borders of these States — in the absence of consent being given for future action to assume jurisdiction — is to retain exclusive Federal jurisdiction until Indian title in such lands is extinguished." S. Rep. No. 699, 1953 U.S. Code Cong. & Admin. News at 2412; *cf. McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 175, 93 S.Ct. 1257, 1264, 36 L.Ed.2d 129 (1973) (Court noted that Congress had acted on the assumption that the states lacked jurisdiction over the Navajos on their reservation). Creek Nation title to the Mackey site has never been extinguished.

*Indian Country, supra,* 829 F.2d at 980.

21

Further, in *Seneca-Cayuga Tribe of Oklahoma v. State of Oklahoma*, 874 F.2d 709, 712 (10th Cir. 1989), the Tenth Circuit addressed the Enabling Act again finding: "Indeed, Oklahoma, like many other states, was required to disclaim jurisdiction over Indians at statehood. *See Oklahoma Enabling Act*, ch. 3335, § 3, 34 Stat. 267, 270 (1906); *Enabling Act Amendment*, ch. 2911, 34 Stat. 1286 (1907); *see generally Indian Country, U.S.A., Inc. v. Okla. Tax Comm'n.*, 829 F.2d at 976-81 (citing § 1 of the *Oklahoma Enabling Act* and interpreting it as a general reservation of Federal and tribal jurisdiction over Indians, their lands and property), *Id.* at 973 *See also U.S. v. Sands*, 968 F.2d 1058, 1062 (10th Cir. 1992).

### D.    The Tenth Circuit Determined that Land Belonging to the Indians Held by the Federal Government is Held in Federal Trust for the Indians.

The land in question in Oklahoma County is land held in federal trust because the government issued a patent for it. A case *Cherokee Nation v. State of Oklahoma*, 461 F.2d 674, 678 (10th Cir. 1972), *cert. denied*, 409 U.S. 1039 (1972), the Court was faced with an issue of land, the Court held:

> The question is not whether the Indians have sovereignty but whether the tribes are still in existence and capable of land ownership. We believe that this question is answered by the 1906 Act. Section 27 thereof provides that, upon dissolution of the tribes, lands belonging to them **shall not become public lands** nor the property of the United States but **shall be held by the United States in trust for the Indians. 34 Stat. 148.** Section 28 provides for the continuation of tribal existence and tribal Government for all purposes authorized by law. *Ibid.*
>
> The Supreme Court has said that "when Congress has once established a [Indian] reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress." *Seymour v. Superintendent*, 368 U.S. 351, 359 (1962). There has been no separation

22

here; the tribal governments still exist; and Oklahoma was admitted to the Union in 1907 upon compliance with the *Enabling Act* of June 16, 1906, 34 Stat. 267, which required a disclaimer of title to all lands owned "by any Indian or Indian tribes." *Ibid*. at 279. We adhere to the conclusion, which was implicit in our first decision, that the Indians have not divested themselves of the land in question. The claims of Oklahoma and its lessees must be rejected.

The Tenth Circuit's opinions addressing the Enabling Act remain consistent because they have been based upon previous decisions that are predicated upon the law and that same law remains in effect today.

### E.    Oklahoma Supreme Court's 1908 Interpretation of the Enabling Act.

In *Higgins v. Brown*, 1908 OK 28, 20 Okla. 355, 94 P. 703, the Court interpreted the Enabling Act which determined:

> ¶ 164 By the same process of reasoning followed by the Supreme Court of the U.S.in cases of *U.S. v. McBratney,* 104 U.S. 621 (1882), and *Draper v. U.S.,* 164 U.S. 240 (1896), we conclude that the Congress, upon the admission of Oklahoma as a State, where it has intended to except out of such state an Indian reservation, or **the sole and exclusive jurisdiction over that reservation, it has done so by express words**. It is not contended that the alleged crime was committed on any such excepted reservation, or in any place where the United States has the sole and exclusive jurisdiction since the admission of the State. Now, mark you the language, "had they been committed within a State would have been cognizable in the Federal Courts," contained in section 16, as amended March 4, 1907, of the Oklahoma Enabling Act. Does not that mean in a State similarly circumstanced as one with Enabling Act like ours? When you consider this language in connection with section 39 of the same Enabling Act pertaining to Arizona and New Mexico, *supra*, it seems that Congress was recognizing the existing conditions and the bringing in of an organized and unorganized territory as one State, and that it was laying down the rule that if such offense had been committed **after the admission of the State it would have been cognizable in the Federal Court, that then such Federal Court would have jurisdiction**; **otherwise not**. Any other conclusion can be reached only by reasoning against the apparent and reasonable literal meaning. *See, also,* the following authorities heretofore

23

cited: *Moore v. U.S.*, 85 F. 465 (8th Cir. 1898); *U.S. v. Kagama*, 118 U.S. 375, (1896); *Ward v. U.S.*, 28 F. Cas. 397, 1 Kan. 601 (1863); *Ward v. Race Horse*, 163 U.S. 504 (1896); *U.S. v. Bailey*, 1 McLean 234, 24 F. Cas. 937 (1834); *State v. Doxtater*, 47 Wis. 278, 2 N.W. 439.

*Id*.

In plain terms, the *Higgins* Court found Congress expressly preempted the unappropriated lands from Oklahoma's jurisdiction, but moreover that land is held in Federal trust. Petitioner states that the preemption begins with the treaties and patents which place the tracts of land beyond the jurisdiction of the state.

### F.    The Absence of Sovereign Authority is Structural Error.

The U.S. Supreme Court principally relies on the doctrine that "an [unlawful] act ... is void and confers no right upon the wrongdoer." *Waskey v. Hammer*, 223 U.S. 85, 94, (1912); *Miller v. Ammon*, 145 U.S. 421, 426 (1892); *Burck v. Taylor*, 152 U.S. 634 (1894); *Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540, 548 (1902); *See also Ewert v. Bluejacket*, 259 U.S. 129, 138 (1922). An unlawful act is structural error where "structural error," which normally infringes upon and compromises the entire proceeding, or as with subject-matter jurisdiction effectively negates it. Structural error may occur at any critical stage of a criminal proceeding. *See U.S. v. Cronic*, 466 U.S. 648, 659 (1984). An error cannot be both structural and subject to harmless-error review. *See Neder v U.S.*, 527 U.S. 1, 8 (1999). The Supreme Court has restricted the use of structural error, with its requirement of automatic reversal, to "a limited class of cases." *Johnson v. U.S.*, 520 U.S. 461, 468-69 (1997) which always require reversal.

24

Petitioner has a Constitutional right to be tried by a court with authority over him, rather than in a Court that is not of competent jurisdiction. The OCCA's resolution of his claims are objectively unreasonable in light of the supreme court precedence relied upon by Petitioner.

**GROUND TWO:**

**PETITIONER WAS DENIED DUE PROCESS BECAUSE HIS CASE WAS NOT HEARD BY AN IMPARTIAL ADJUDICATOR.**

**ARGUMENT AND AUTHORITY**

Petitioner alleged in state post-conviction proceedings that he was denied the constitutional right to have his case heard by an impartial adjudicator. The claim was presented as a structural due-process violation. Petitioner relied on the principle that a criminal defendant is entitled to a neutral and detached judge, and that bias, the appearance of bias, or an unconstitutional probability of bias violates due process.

Petitioner argued that Judge Gray failed to promptly hold a hearing on his application for habeas corpus that was filed on October 30, 2003. It was not until June 14, 2004, that the District Court held a hearing on that matter which clearly showed bias against Petitioner's rights to due process.

On June 25, 2004, Petitioner filed a Motion asking the District Judge to recuse from sitting over Petitioner's trial. Petitioner argued that because he had been incarcerated in the County jail for more than a year without a hearing violated his constitutional rights as the Judge neglected her duty. Petitioner specifically argued 22 O.S. §, 812.1(A) which provided:

25

A. If any person charged with a crime and held in jail solely be reason thereof is not brought to trial within one (1) year after arrest, the court shall set the case for immediate review as provided in Section 2 of this act, to determine if the right of the accused to a speedy trial is being protected.

Petitioner filed various pretrial motions that were all meritorious but were denied. On July 1, 2004, Petitioner filed an application for an immediate bond hearing which his request was also denied.

On January 18, 2005, Petitioner filed a motion "For Removal of the Un-honorable [sic] Twyla M. Gray…." In this Motion, Petitioner argued 17 supporting paragraphs for removing Judge Gray, which all indicated a form of bias and thus removed all impartiality. Petitioner further argued that Judge Gray displayed actual bias because she was not impartial.

Petitioner argues that in *Carter v. State*, 2006 OK CR 42, 147 P.3d 243 (2006) (Twyla Mason Gray, REVERSED AND REMANDED FOR RE-SENTENCING) An abuse of discretion occurred. Then *McCarty v. State*, 2005 OK CR 10, 114 P.3d 1089 (Twyla Mason Gray, REVERSED, his death sentence VACATED, and REMANDED to the District Court of Oklahoma County for a new trial.) Further Petitioner argues that in *Durant v. State*, 2008 OK CR 17, 188 P.3d 192 (2008) (Twyla Mason Gray, REVERSED) (No crime committed) Here the OCCA reversed and remanded the case and found no crime had been committed. Yet, the judge sat idly by and allowed a conviction when no crime was committed.

26

Petitioner argues that the error of having an impartial judge that clearly displays bias against Petitioner must be viewed as structural error. An error cannot be both structural and subject to harmless-error review. *See Neder v. United States*, 527 U.S. 1, 8 (1999). "[A]n error has been deemed structural if the error always results in fundamental unfairness." *Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017). A judge must recuse under § 455(a) "if sufficient factual grounds exist to cause a reasonable, objective person, knowing all the relevant facts, to question the judge's impartiality." *United States v. Pearson*, 203 F.3d 1243, 1277 (10th Cir. 2000).

Petitioner argues that because his trial counsel was conflicted that Judge Gray should have appointed him conflict free counsel. Prejudice is presumed if a defendant demonstrates that his attorney "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). Petitioner argued to the Court about the conflict, and it was undisputed there was a conflict but yet again the judge did note to ensure that Petitioner had conflict free counsel.

The Due Process Clause requires a fair trial in a fair tribunal. *Tumey v. Ohio*, 273 U.S. 510, 535 (1927). The Supreme Court has long held that justice must satisfy the appearance of justice and that an unconstitutional probability of bias requires relief. *In re Murchison*, 349 U.S. 133, 136 (1955); *Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 876-87 (2009). A judge who had significant, personal participation as prosecutor in a critical decision in the defendant's case may not later sit in judicial review of that case.

27

*Williams v. Pennsylvania,* 579 U.S. 1, 8-14 (2016). Denial of an impartial adjudicator is structural error because it infects the entire framework of the proceeding.

## VIII.  Conclusion

The OCCA did not reject the bias claim on the merits. Instead, it held that Petitioner failed to establish why the claim could not have been raised earlier and therefore treated it as waived under state post-conviction procedural rules.

Why the procedural ruling should not bar federal review. The state procedural ruling is not adequate to bar federal review as applied here because Petitioner challenges the custody-authorizing judgment entered in 2024 and alleges structural due-process error affecting the validity of the judgment under which he is presently held. A state procedural bar must be adequate, independent, and regularly applied before it can preclude federal review. *Coleman*, 501 U.S. at 729-32. Applying waiver to avoid any review of a structural impartial-tribunal claim after entry of a new amended judgment is not an adequate ground to foreclose federal review of the present custody judgment.

Alternatively, if the Court determines the claim is procedurally defaulted, Petitioner pleads cause and prejudice. Cause exists because the state courts treated the claim as unavailable for merits review after the 2024 Amended Judgment and Sentence, and because the procedural posture created by the delayed amendment to the judgment supplied the first meaningful opportunity to challenge the present custody-authorizing judgment. Prejudice is inherent because denial of an impartial tribunal is structural constitutional error that necessarily undermines the fairness and legitimacy of the

proceeding. See *Tumey*, 273 U.S. at 535; *Caperton*, 556 U.S. at 876; *Williams*, 579 U.S. at 8-14.

Because the OCCA disposed of the judicial-bias claim on procedural grounds and did not adjudicate the federal due-process merits, this Court should review the merits de novo or, at minimum, determine that the procedural ruling was inadequate to bar review. If § 2254(d) applies, the state court's refusal to permit merits review was contrary to and an unreasonable application of the Supreme Court's impartial-tribunal cases and rested on an unreasonable view of the effect of the 2024 Amended Judgment and Sentence.

The Court should grant the writ, vacate the Amended Judgment and Sentence, and order a new constitutionally valid proceeding before an impartial tribunal, or order Petitioner released unless the State affords such proceedings within a reasonable time set by the Court.

## IX.    REQUEST FOR EVIDENTIARY HEARING

Petitioner requests an evidentiary hearing if the Court determines that additional factual development is necessary regarding the 2024 Amended Judgment and Sentence, the State's claimed sovereign authority over the land in question, the facts supporting the impartial-adjudicator claim, cause and prejudice, or equitable tolling. Petitioner diligently pursued the claims in state post-conviction proceedings and requested an evidentiary hearing there. To the extent the state courts declined factual development, Petitioner requests a federal hearing consistent with 28 U.S.C. § 2254(e)(2), *Schriro v. Landrigan,* 550 U.S. 465, 473-75 (2007), and the Rules Governing Section 2254 Cases.

## X.    RELIEF REQUESTED

WHEREFORE, Petitioner respectfully requests that this Court issue the writ of habeas corpus, vacate the Amended Judgment and Sentence entered in Oklahoma County District Court Case No. CF-2003-69, and order Petitioner released unless the proper sovereign obtains lawful custody and commences lawful proceedings within a reasonable time set by this Court. In the alternative, Petitioner requests that this Court order an evidentiary hearing and any additional briefing necessary to resolve the claims presented. If relief is denied, Petitioner respectfully requests that this Court grant a certificate of appealability on all claims and grant all other relief this Court deems just and proper.

Respectfully submitted,


/s/ DEBRA K. HAMPTON
DEBRA K. HAMPTON, OBA # 13621
Hampton Law Office, PLLC
3126 S. Blvd., # 304
Edmond, OK 73013
(405) 250-0966
Fax: (405) 896-4259
debbie@hamptonlaw.net
**Attorney for Petitioner**

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2026, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant: Office of the Attorney General, fhc.docket@oag.state.ok.us

I hereby certify that on June 9, 2026, I mailed a copy of the same to Petitioner who is not registered participants of the ECF System.

/s/ DEBRA K. HAMPTON
DEBRA K. HAMPTON

30

## VERIFICATION

I, CHARLES C. TIGER # 276550, hereby declare under penalty of perjury that the foregoing Petition for Writ of Habeas Corpus is true and correct and verified by me and will be electronically filed by my attorney, Debra K. Hampton.

Executed on February 26, 2026.

*Charles Tiger 276550*

**CHARLES C. TIGER # 276550**
JCCC
216 N. Murray Street
Helena, OK 73741-1017